**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| JACQUELINE HORTON, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br>v.<br>WILLIS-KNIGHTON MEDICAL CENTER<br><br>Defendant. | CASE NO. 23-cv-0314<br><br>(Removal from: the Tenth Judicial District Court, Docket No. C-93767, Division B)<br><br>Jury Trial Demanded |

**NOTICE OF REMOVAL**

Defendant Willis-Knighton Medical Center (WKMC) hereby removes this putative class action to federal court pursuant to the Federal Officer Removal Statute, codified at 28 U.S.C. § 1442(a)(1). In support of this removal, WKMC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014).

**NATURE OF THE CASE**

1.      On January 30, 2023, plaintiff Jacqueline Horton filed a Class Action Petition against defendant Willis-Knighton Medical Center in the Tenth Judicial District Court, Docket No. C-93767, Division B. (*See* Ex. A, Verified Dckt., Horton Pet., filed Jan. 30, 2023.) Plaintiff Jacqueline Horton served defendant Willis-Knighton Medical Center with the Petition on February 7, 2023.

2.      The underlying factual basis for the petition is that WKMC allegedly violated Louisiana law by embedding certain third-party source code onto WKMC's publicly available websites. This source code is referred to in the petition as the "Meta Pixel." (*See* Ex. A, Horton Pet. ¶ 53.)

3.      Plaintiff alleges that WKMC "is among the hospital systems who have embedded the Meta Pixel on their websites." (*Id.*, ¶ 85.) Plaintiff alleges that "[o]nce Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as 'optional values' by the business website." (*Id.*, ¶ 65.)

4.      Because of this, plaintiff alleges that WKMC "disclosed the contents of patients' communications and protected health information *via* automatic re-routing mechanisms embedded in the websites operated by Defendant without its patients' knowledge, authorization, or consent." (*Id.*, ¶ 18.)

5.      From these baseline allegations, plaintiff claims that "Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented." (*Id.*, ¶ 80.)

6.      At the same time, plaintiff also acknowledges that "Meta Pixel is wildly popular and embedded on millions of websites," including "many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems." (*Id.*, ¶¶ 82-83.)

7.      Plaintiff's petition contains two counts. First, plaintiff alleges that WKMC violated the Louisiana Wiretap Act by embedding the Meta Pixel source code on its website. (*Id.*, ¶¶ 180-203.) Second, plaintiff alleges that WKMC was unjustly enriched through the Meta Pixel source code. (*Id.*, ¶¶ 204-210.)

8.      Plaintiff seeks to represent a putative class in pursuing these claims, defined as follows: "All current citizens of the state of Louisiana who, from June 15, 2012, thru [the Date of Certification] are, or were, actual or prospective patients of WKMC Health or any of its affiliates and who exchanged communications on one or more of WKMC's websites." (*Id.*, ¶ 170.)

## BASIS FOR REMOVAL

**I.     Removal is Proper Pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).**

9.     WKMC removes this case pursuant to the federal officer removal statute, codified at 28 U.S.C. § 1442(a). Under that statute, a civil action that is "against or directed to" any of the following may be removed to federal court: "(1) the United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency therefore, in an office or individual capacity, *for or relating to any act under color of such office . . . .*" *Id.* § 1442(a)(1) (emphasis added).

10.     The Fifth Circuit has held that the purpose of the statute is "to give those who carry out federal policy a more favorable forum than they might find in state court." *Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 232 (5th Cir. 2022).

11.     To remove under the statute, defendant WKMC must show that: "(1) they are a 'person' within the meaning of the statute; (2) they acted 'pursuant to a federal officer's directions;' (3) they assert a 'colorable federal defense'; and (4) there is 'a causal nexus' between the defendant's acts under color of federal office and the plaintiff's claims." *Id.* at 234 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020)).

**A.     *WKMC is a "Person" within the meaning of the statute.***

12.     Plaintiff alleges that defendant WKMC is a "Louisiana corporation with its principal place of business in the Parish of Caddo[.]" (Ex. A, Horton Pet. ¶ 8.)

13.     Defendant WKMC is thus a person under the federal officer removal statute. *See, e.g., Dempster v. Lamorak Ins. Co.*, 435 F. Supp. 3d 708, 723-24 (E.D. La. 2020) ("Both the Supreme Court and the Fifth Circuit have recognized that the removal statute applies to both

3

private persons and corporate entities who lawfully assist the federal officer in the performance of his official duty.") (quotation omitted).

   **B.**  ***WKMC Acted Pursuant to a Federal Officer's Directions.***

  14.  Federal officer removal under 28 U.S.C. § 1442(a)(1) is appropriate in this case because of how plaintiff's claims relate to the WKMC patient portal. Specifically, the WKMC website identified in the petition contains a direct link to the login page for two WKMC patient portals, available at: https://www.wkhs.com/mywk, as set forth below:



  15.  Through this link, WKMC patients, as well as their parents, guardians and wards, can log into their OneWK patient portal accounts, available at https://patients.wkhs.com/Phm-PhmHome.HomePage.WR.mthr?hcis=WIKGBL.LIVE&application=PHM  and

https://patientportal.intelichart.com/login/Account/Login/19301214522802910625205605301821 5127053070212147?ReturnUrl=/&EFID=19301214522802910625205605301821512705307021 2147, respectively.

    16.    Images for both patient portal links are again set forth below:



17.     WKMC acted, and continues to act, pursuant to federal officer direction in making these patient portals available online to WKMC's patients and the other third parties who have legitimate access to their accounts.

18.     This federal action first began in 2004. At that time, and "to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care," President George W. Bush first established "the position of National Health Information Technology Coordinator." *See* Exec. Order 13335, at pg. 702 (Apr. 27, 2004), *Incentives for the Use of Health Information Technology and Establishing the Position of the National Health Information Technology Coordinator*, available at https://www.presidency.ucsb.edu/documents/executive-order-13335-incentives-for-the-use-health-information-technology-and.

19.     In this Executive Order, the President tasked the National Health Coordinator with putting together a nationwide strategic plan to "[a]dvance the development, adoption, and implementation of health care information technology standards nationally through collaboration among public and private interests, and consistent with current efforts to set health information technology standards for use by the federal government." *Id.* at pg. 703.

20.     In 2009, following the Executive's lead, Congress then acted next, through the Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH Act).

21.     The HITECH Act not only codified the National Coordinator position, *see* 123 Stat. 115, 230 (2009), but further "allocated billions of dollars for the health care system to adopt and meaningfully use health IT to improve health." Office of the Nat'l Coordinator for Health Information Technology (ONC), *Federal Health Information Strategic Plan, 2011-2015*, at pg. 4, available at https://www.healthit.gov/sites/default/files/utility/final-federal-health-it-strategic-

plan-0911.pdf; 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (Cong. Res. Serv. Apr. 27, 2009) (discussing various financial incentives; "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs.").

22.    The following year, the Department of Health and Human Services implemented this Congressional enactment through the Meaningful Use regulations, which are now known as the Promoting Interoperability Program regulations. *See* Vol. 75 Fed. Reg., No. 144, pg. 44314 (Jul. 28, 2010). In introducing the final regulations the Department of Health and Human Services stated: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, 44321.

23.    The Department adopted a "phased approach" to the Meaningful Use regulations, with three stages. *See* 42 C.F.R. § 495.20 (Meaningful use objectives and measures for EPs, eligible hospitals, and CAHs before 2015); 42 C.F.R. § 495.22 (same for 2015 through 2018); 42 C.F.R. § 495.24 (Stage 3 meaningful use objectives for 2019 and subsequent years).

24.    From its inception, one constant in this federal health information technology initiative has been for health care providers to provide patient and caretaker access to their health information online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at pg. e (July 21, 2004) (discussing a "Medicare beneficiary portal"); *id.* at Attachment 1, Off. of

Personnel Mang't Rep. at 6-7 (July 2004) (discussing "MyAnthem," which "provides an easy way to help members gain more control over their health care benefits through secure access that's available at any time and from any place"); *id.* at Attachment 2, Veteran Affairs Rep., at 18 (July 15, 2004) (discussing "My HealtheVet – The Personal Health Record").

25.    Thus also, the Meaningful Use regulations themselves contained a firm directive from the federal government to provide individuals with the ability to view their patient health records online. *See, e.g.,* 42 C.F.R. § 495.20(f)(12)(i)(B) (Objective) ("Beginning in 2014, provide patients with the ability to view online, download, and transmit information about a hospital admission."); *id.* at (ii)(B) (Measure) (health care provider must attest that "more than 50 percent of all unique patients who are discharged from the inpatient or emergency department of an eligible hospital or CAH have their information available online within 36 hours after discharge"); Rebecca Mitchell Coelius, *Get the facts regarding view, download and transmit 2014 requirements*, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.").

26.    The federal government further provided direction to health care providers regarding how to meet these requirements, including specifically with respect to online patient portals. As stated in one federal government publication, entitled *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013): "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." *Id.* at pg. 1, available at

https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

27.     The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* at 1. Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use.*" (*Id.* at pg. 1.)

28.     The National Coordinator even issued a "Patient Engagement Playbook," described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." *ONC, Patient Engagement Playbook*, at pg. 1. "In this playbook, we demystify patient portals and describe how you can make them work for you and your patients." *Id.* at 2.

29.     This federal command came with consequence: if health systems did not meet the Meaningful Use requirements, including with respect to electronic health record access, they would not receive their full Medicare reimbursements. Under the Meaningful Use Program, this meant that they would be precluded from receiving incentive payments for meeting meaningful use. Under the Promoting Interoperability Program, providers are not entitled to receive the full amount of Medicare reimbursements if they do not meet the specific regulatory requirements. Congress thus used the power of the purse to control health care providers like WKMC into making patient portals available online.

30.     As plaintiff's petition shows, WKMC acted in response to this federal command, by being one of the entities that made a patient portal available online to its patients.

31.     Thus also, as two district courts have held, the federal officer removal statute's acting under requirement is met. *Doe, et al. v. UPMC*, 2020 WL 4381675, *7 (W. D. Pa. Jul.31, 2020), *interlocutory appeal denied*, 2020WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use Program, it was 'acting under' DHHS when it engaged in the conduct at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) (same; "Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' prong").

### E.     *WKMC Raises Colorable Federal Defenses to Plaintiff's Claims*

32.     The next requirement for federal officer removal is the establishment of a colorable federal defense. Here, WKMC has at least two colorable federal defenses to the claims at issue that satisfy this requirement.

33.     First, WKMC also has a preemption defense to plaintiff's claims, at least to the extent that the claims relate to alleged unjust enrichment or illegal wiretapping for the patient portal link. Federal law preempts state action "either by express provision, by implication, or by a conflict between federal and state law." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *see also Murphy v. Nat'l Coll. Ath. Ass'n*, 138 S. Ct. 1461, 1480 (2018) (discussing preemption doctrines).

34.     Under this precedent, a defendant cannot be held liable under state law for doing precisely what the federal government wants them to do—as applied here, not only making a patient portal available online to patients but also promoting the meaningful use of that portal. *See,*

*e.g., Boggs v. Boggs*, 520 U.S. 833, 844 (1997) ("Conventional conflict pre-emption principles require pre-emption where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

35.     *Second*, WKMC will argue that the First Amendment is a federal defense to the entirety of plaintiff's petition. As the Supreme Court has held: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. Am. Civil Libs. Union*, 521 U.S. 844, 868 (1997)).

36.     In *IMS Health Co. v. Sorrell*, 564 U.S. 552 (2011), the Court further made plain that the First Amendment protects both "the creation and dissemination of information," as they are both "speech within the meaning of the First Amendment." *Id.* at 570 (emphasis added).

37.     Plaintiff's amended petition challenges how WKMC uses website analytics to enhance WKMC's ability to speak to the public, through the creation and dissemination of information. (Ex. A, Horton Pet. ¶¶ 60-62.) Indeed, plaintiff specifically alleges that these analytical tools are "designed for interactive communication with potential customers and patients," including, *inter alia*, "scheduling appointments," "searching for physicians," "learning about medical issues [and] treatment options," and "joining support groups." (Ex. A, Horton Pet. ¶ 18.)

38.     Thus, WKMC has a First Amendment defense to plaintiff's complaint. *Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("The constitutional guarantee of free speech serves significant societal interests apart from the speaker's interest in self-expression.

By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information.").

       **D.**    ***There is a causal nexus between WKMC's patient portal and plaintiff's claims.***

    39.    Finally, there is a causal nexus between WKMC's actions taken under color of federal law and plaintiff's claims. Stated simply, plaintiff's petition seeks to impose liability upon WKMC based on alleged disclosures made to Facebook in connection with a patient, potential patient, ward, guardian or any other third party clicking on the link to the patient portal on WKMC websites.

    40.    Specifically, plaintiff alleges that "Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time." (Ex. A, Horton Pet. ¶ 84.)

    41.    Thus also, "the moment that a patient takes any action on a webpage that includes the Meta Pixel—***such as clicking a button to register, login, or logout of a patient portal*** or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring." (*Id.*)

    42.    Plaintiff thus alleges that it is a violation of Louisiana's Wiretap Act merely to have a link to the patient portal on the website, at least where any disclosure is made to any third party. *See, e.g., In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 501 (S.D.N.Y. 2001) ("The 'Internet' is a shorthand name for the vast collection of interconnected computer networks that evolved from the Advanced Research Projects Agency Network ('ARPANet') developed by the United States Defense Department in the 1960's and 1970's. Today, the Internet spans the globe and connects hundreds of thousands of independent networks.").

43.     Moreover, plaintiff specifically alleges that their Wiretap Act claim is based on any potential interaction with WKMC's websites: "***All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Louisiana law*** because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections." (Ex. A, Horton Pet. ¶ 186 (emphasis added).)

44.     This infringement on a federal prerogative is precisely the type of case that "relates to" or is "undertaken for" federal office, and that belongs in a federal court. Indeed, to this day, the federal government itself uses the Meta Pixel to promote Medicare's own patient portal:



## PROCEDURAL REQUIREMENTS FOR REMOVAL

45.     WKMC satisfies all of the procedural requirements under 28 U.S.C. § 1446.

46.     WKMC is filing this Notice of Removal within thirty (30) days of its receipt of any petition by service pursuant to 28 U.S.C. § 1446. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

47.     WKMC files this Notice of Removal in the United States District Court of the Western District of Louisiana, because the State court in which the action is pending, the Tenth Judicial District Court, is within this federal judicial district. This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

48.     WKMC has attached a complete copy of the Verified Docket from the Tenth Judicial District Court, including the petition that was served upon WKMC prior to filing this Notice of Removal. Upon filing this Notice of Removal, WKMC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Tenth Judicial District Court.

## CONCLUSION

The federal "Mission" set forth in the National Coordinator's initial strategic plan was as follows: "To improve health and health care for all Americans through the use of information and technology." Office of the Nat'l Coordinator for Health Information Technology (ONC), *Federal Health Information Strategic Plan, 2011-2015*, at pg. 6. Plaintiff's petition directly challenges practices and procedures WKMC has taken acting under color of federal law. Plaintiff's petition is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

Dated: March 8, 2023

Respectfully submitted,

/s/ *Lamar P. Pugh*
Lamar P. Pugh, La. Bar Roll Number 20070
Robert G. Pugh, III, La. Bar Roll Number 36631
PUGH, PUGH & PUGH, L.L.P.
333 Texas Street, Suite 2100
Shreveport, Louisiana 71101
Telephone: 318.227.2270
Email: lamar@thepughlawfirm.com
         gahagan@thepughlawfirm.com

David A. Carney (*pro hac vice forthcoming*)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: 216.621.0200
Email:  dcarney@bakerlaw.com

*Attorneys for Defendant Willis-Knighton*
*Medical Center*

**CERTIFICATE OF SERVICE**

I certify that on March 8, 2023, I filed the foregoing *Notice of Removal* with the Court's ECF system. A copy will be sent electronically to all counsel of record by operation of the ECF system.

*/s/ Lamar P. Pugh*
*One of the attorneys for Defendant WKMC*